1:17-cv-05045-ER

*19-1094*
*Felder v. USTA*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 07 2022

1       **UNITED STATES COURT OF APPEALS**
2       **FOR THE SECOND CIRCUIT**
3
4       August Term 2020
5
6       (Argued: January 27, 2021     Decided: March 7, 2022)
7
8       No. 19-1094
9
10      _____
11
12      SEAN G. FELDER
13
14      *Plaintiff-Appellant*
15
16      -v.-
17
18      UNITED STATES TENNIS ASSOCIATION
19
20      *Defendant-Appellee,*
21
22      UNITED STATES TENNIS ASSOCIATION INCORPORATED, REED SMITH LLP
23
24      *Defendants.*[1]
25
26      _____
27      On Appeal from the United States District Court
28      for the Southern District of New York
       _____
29

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above. Plaintiff-Appellant does not appeal the District Court's dismissal of his claims against Reed Smith LLP. *See* Reply Br. at 1 n.1.

CERTIFIED COPY ISSUED ON 03/07/2022

1

1    Before:        LIVINGSTON, *Chief Judge*, CABRANES and LYNCH, *Circuit Judges*.
2
3         Sean G. Felder appeals the dismissal by the United States District Court for
4    the Southern District of New York (Ramos, *J.*) of his amended complaint alleging
5    that the United States Tennis Association ("USTA") discriminated and retaliated
6    against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.
7    §§ 2000e–2, 2000e–3(a), and discriminatorily interfered with his employment
8    contract with AJ Squared Security, in violation of 42 U.S.C. § 1981, by rejecting his
9    temporary assignment as a security guard for the 2016 U.S. Open.   We concur
10   with the District Court that Felder has failed to state any claim for relief under Title
11   VII or § 1981.    First, Felder did not plausibly allege the existence of an employer-
12   employee relationship necessary to sustain his Title VII claims.    Second, Felder
13   did not allege any facts to support his claim under § 1981 that, but for his race, the
14   USTA would not have interfered with his employment contract.    However,
15   because Felder—represented by court-appointed counsel for the first time on
16   appeal—has indicated that he can plead further allegations of a "joint employer"
17   relationship, and because Felder has plausibly alleged that the USTA rejected his
18   assignment in retaliation for his protected activities against a USTA subcontractor,
19   we **VACATE** the District Court's dismissal of Felder's Title VII retaliation claim
20   under 42 U.S.C. § 2000e–3(a), and **REMAND** with instructions that Felder be
21   permitted to amend his complaint as to that claim.    We otherwise **AFFIRM** the
22   District Court's dismissal with prejudice of Felder's remaining Title VII and § 1981
23   discrimination claims.
24
25         Judge Lynch dissents in part in a separate opinion.
26
27   FOR PLAINTIFF-APPELLANT:          REBECCA LYN GUTHRIE, Michael W. Martin,
28                                     Ian   Weinstein,   Quinn   D'Isa,   Sophia
29                                     Porotsky, Elena Cicognani (*on the brief*),
30                                     Lincoln Square Legal Services Inc., Fordham
31                                     University School of Law, New York, NY
32
33   FOR DEFENDANT-APPELLEE:           STEPHANIE   WILSON,   Reed   Smith   LLP,
34                                     Princeton, NJ
35

1   DEBRA ANN LIVINGSTON, *Chief Judge*:

2

3        This case presents the question of what a Title VII plaintiff must adequately

4   allege to plead the existence of an employer-employee relationship pursuant to the

5   "joint employer" doctrine.   It has long been understood by our Court that "the

6   existence of an employer-employee relationship is a primary element of Title VII

7   claims."   *Gulino v. N.Y.S. Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006).   To that

8   end, we have remarked that when, for example, "a plaintiff is found to be an

9   independent contractor and not an employee . . . the Title VII claim must fail."

10  *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).   The plausible

11  existence of a requisite employer-employee relationship is thus a cornerstone of

12  an adequately pled Title VII complaint.

13        Nonetheless, in alleging an employer-employee relationship, an employee

14  is not squarely limited to claims against his or her *formal* employer.   Pursuant to

15  the "joint employer doctrine," an employee may assert Title VII liability against a

16  "constructive employer"—an entity that shares in controlling the terms and

17  conditions of a plaintiff's employment.   *See Arculeo v. On-Site Sales & Mktg., LLC*,

18  425 F.3d 193, 198 (2d Cir. 2005).   Most commonly, the "joint employer doctrine"

19  applies "where the plaintiff's employment is subcontracted by one employer to

3

1    another, formally distinct, entity."   *Gulino*, 460 F.3d at 378.   Although this Court

2    has not previously identified a specific test for determining what renders an entity

3    a "joint employer" in a Title VII case, today we join our sister Circuits in

4    concluding that non-exhaustive factors drawn from the common law of agency,

5    including control over an employee's hiring, firing, training, promotion,

6    discipline, supervision, and handling of records, insurance, and payroll, are

7    relevant to this inquiry.

8         Defendant-Appellee, the United States Tennis Association ("USTA"),

9    contracts with security firms that employ and assign security guards to work at

10    USTA events—most notably, the U.S. Open Tennis Championships ("U.S.

11    Open").[2]   In 2016, AJ Squared Security ("AJ Security"), a security firm, hired

12    Plaintiff-Appellant Sean G. Felder ("Felder") as a security guard and assigned him

13    to work at the 2016 U.S. Open.   On August 29, 2016, Felder's AJ Security

14    supervisor sent Felder to pick up his security credentials from the USTA.   Felder

15    alleges, however, that the USTA refused to issue his security credentials, thereby

16    prohibiting him from working at the U.S. Open.   Felder sued the USTA pursuant

---

[2] "The US Open Tennis Championship is the premier professional tennis event in the United States and is one of the four most important tournaments in the world, which collectively comprise the prestigious 'Grand Slam[]' of tennis."   App'x 70.

1    to Title VII and also 42 U.S.C. § 1981, alleging that it denied his credentials because

2    of his race and in retaliation for a lawsuit that he had previously filed in 2012

3    against CSC Security Services ("CSC"), another firm providing security to the

4    USTA.

5        The parties do not dispute that AJ Security was Felder's formal employer.

6    But Felder argues that his complaint adequately alleges that the USTA was his

7    joint employer and therefore subject to Title VII's prohibitions on discrimination

8    and retaliation.   We disagree.   An entity can only be liable under Title VII as a

9    joint employer for *rejecting* the temporary assignment of a contractor's employee

10    if the entity would have been the employee's joint employer had it *accepted* his

11    assignment.   To plausibly allege that the parties intended to enter into a joint-

12    employment relationship, then, a plaintiff must allege that the entity *would have*

13    exercised significant control over the terms and conditions of his employment by,

14    for example, training, supervising, and issuing his paychecks.   Because Felder's

15    complaint is devoid of any such allegations, his Title VII claims must fail.

16        We therefore find no error in the dismissal by the United States District

17    Court for the Southern District of New York (Ramos, *J.*) of Felder's Title VII claims

18    and affirm the dismissal of Felder's Title VII discrimination claim under 42 U.S.C.

1    § 2000e–2.[3]   However, we vacate the District Court's dismissal of Felder's Title

2    VII retaliation claim under § 2000e–3(a), because Felder *has* plausibly alleged that

3    the USTA denied his credentials in retaliation for the lawsuit he filed against his

4    former employer, CSC, and has further represented that he can plead additional

5    indicia of a joint employer relationship now that he is represented by counsel.

6    We therefore remand with instructions that Felder be permitted to amend his

7    complaint as to that claim.   We separately affirm the District Court's dismissal of

8    Felder's § 1981 claim because he has failed to plausibly allege that the USTA

9    interfered with his employment contract with AJ Security because of his race.

10    **BACKGROUND**

11    **I.   Factual Background**[4]

12    The USTA contracts with security firms that hire and assign their security

13    guards to work at various USTA events, including the annual U.S. Open.   From

---

[3] As to his discrimination claim, Felder also failed to plausibly allege that the USTA discriminated against him on the basis of race in refusing him security credentials.

[4] "In determining the sufficiency of [Felder's] Amended Complaint," the District Court "consider[ed] the allegations of race discrimination and retaliation set forth in both [his] Original Complaint and [his] Amended Complaint," because Felder had simply "restate[d] all of the allegations contained in [his] Original Complaint." App'x 182 n.1. The District Court also considered additional factual allegations appearing in supplemental letters that Felder submitted to the court. Because we liberally construe the pleadings and submissions of *pro se* litigants, *see McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017), the factual background presented here is similarly

1   2002 to 2009, Felder, a Black man residing in New York City, worked as a security

2   guard for CSC, a USTA contractor, to provide seasonal security work for the

3   USTA.   In 2012, Felder filed a lawsuit against CSC for discriminatory and

4   retaliatory refusal to hire under Title VII, 42 U.S.C. § 1981, and the New York City

5   Human Rights Law, alleging that CSC refused to hire him in 2010 after he

6   complained "[d]uring his employment [at the U.S. Open] in 2009 . . . that African

7   American security personnel were given inferior assignments and White security

8   personnel were given the better assignments."   *See* Plaintiff's Second Amended

9   Complaint at 3, *Felder v. Contemp. Sec. Servs.*, No. 1:12-cv-07486 (S.D.N.Y. Aug. 20,

10  2014), ECF No. 51.   The parties reached a settlement for an undisclosed amount

11  in 2015.   *See* Stipulation of Final Dismissal with Prejudice, *Felder v. Contemp. Sec.*

12  *Servs.*, No. 1:12-cv-07486 (S.D.N.Y. July 22, 2015), ECF No. 103.

13       Felder was later hired as a security officer by AJ Security in August 2016.

14  AJ Security is alleged to be a subcontractor of CSC, which in turn contracts with

15  the USTA to provide security for USTA events.[5]   AJ Security assigned Felder to

---

derived from allegations in Felder's complaints and submissions to the District Court, which we accept as true in considering a motion to dismiss.

[5] It is unclear if AJ Security contracts directly with the USTA, or if AJ Security is a subcontractor of CSC.   The District Court stated that "AJ Security appears to be a subcontractor of CSC," App'x 182, and Felder does not dispute this characterization on appeal.   We therefore presume for purposes of resolving this dispute that AJ Security is

1    work as a temporary security guard at the 2016 U.S. Open.    Felder's supervisor

2    at AJ Security, Terrence Rauls, told Felder to "go to the [USTA] credential office at

3    Flushing, Queens NY on August 29, 2016" to pick up his security credentials for

4    the U.S. Open.    App'x 101.    When Felder went to pick up his credentials, he was

5    told by an unidentified woman that his name was not in the system.    Felder called

6    his supervisor at AJ Security, who allegedly told him that the USTA denied his

7    credentials as retaliation for his earlier employment discrimination complaint

8    against, and settlement with, CSC.[6]    Without security credentials, Felder was

9    unable to work at the U.S. Open.

10                              **II.    Procedural History**

11           Shortly after the USTA denied Felder his security credentials, Felder filed a

12    verified complaint against the USTA with the New York State Division of Human

---

a subcontractor of CSC, which in turn contracts with the USTA.

[6] Felder variously alleges that (1) the "USTA retaliated due to [the] 8/3/10 complaint [against] CSC Security," App'x 14, that (2) the "USTA retaliated" because he "won" his case against CSC in 2015, *id.* at 15, (3) that "due to [the] Jan. 2015 settlement vs [sic] CSC Security" the USTA "blackball[ed]" him and denied his credentials "due to past bad press against CSC Security," *id.* at 143, and (4) that "T[errence] Rauls" told him "on [the] phone . . . that [the] USTA den[ied him his] US Open Tennis work credential due to 8/3/10 incident with former CSC VP S. Dennison," *id.* at 147.    We understand these allegations to collectively assert that the USTA denied Felder's work credentials due to the 2012 lawsuit he filed in connection with CSC's refusal to hire him in 2010, resulting in a 2015 settlement between the parties.

1   Rights ("NYSDHR") and the Equal Employment Opportunity Commission

2   ("EEOC"), alleging discriminatory and retaliatory treatment in violation of the

3   New York State Human Rights Law and Title VII.   On February 27, 2017, the

4   NYSDHR dismissed his complaint, stating that "[t]he Division investigation

5   established that [the USTA] did not employ [Felder] in any capacity," and that "the

6   Division [could not] conclude that there was a violation of the State Human Rights

7   Law as alleged."   App'x 67.   On May 1, 2017, the EEOC adopted the findings of

8   the NYSDHR and issued Felder a notice of right-to-sue.

9        On July 5, 2017, Felder filed this lawsuit against the USTA, alleging claims

10  of discrimination and retaliation under Title VII and 42 U.S.C. § 1981, along with

11  an array of other claims.   The USTA moved for judgment on the pleadings under

12  Federal Rule of Civil Procedure 12(c), arguing, *inter alia*, that Felder had not

13  alleged a prima facie case of employment discrimination or retaliation because

14  Felder "did not apply for a position at the USTA" and the USTA was therefore not

15  his employer.   Memorandum of Law at 4, *Felder v. U.S. Tennis Ass'n*, No. 1:17-cv-

16  05045-ER (S.D.N.Y. May 25, 2018), ECF No. 30.

17       The District Court granted the USTA's Rule 12(c) motion to dismiss Felder's

18  complaint.   The court determined that Felder had not stated a claim under Title

1   VII or § 1981 because he had not established that an employer-employee

2   relationship "existed between the parties at the time of the alleged unlawful

3   conduct."   App'x 127.   First, the court noted that Felder was not a formal

4   employee of the USTA, because he was never hired by or compensated by the

5   USTA.   Nor had Felder adequately alleged that he was entitled to relief under

6   any alternate theory of employer liability, including the "single employer

7   doctrine"—which applies "where two nominally separate entities are actually part

8   of a single integrated enterprise"—or the "joint employer doctrine"—which

9   applies when an "employee is at the same time constructively employed by

10  another entity."   App'x 128 (citations omitted).   As to the joint employer

11  doctrine, the District Court remarked that "Felder ha[d] not alleged that the USTA

12  shared immediate control over him with AJ Security or CSC, and thus joint

13  employer liability [was] inapplicable."   App'x 130.   The court therefore

14  dismissed Felder's complaint but permitted Felder to replead his Title VII and §

15  1981 claims.

16          Felder replied by letter to the court that he was "not interested" in amending

17  his complaint, asking the court when it would "force [the] USTA to settle our

18  case."   App'x 133.   Ultimately, Felder did amend his complaint, not only

1    regarding the Title VII and § 1981 claims, but also adding the USTA's counsel,

2    Reed Smith LLP, as a defendant.   Felder did not provide any additional factual

3    allegations to demonstrate that the USTA was either his formal or joint employer.

4        The USTA again moved to dismiss his complaint, this time under Rule

5    12(b)(6), arguing that Felder had failed to state a plausible claim for relief because

6    Felder was not an employee of the USTA.   Memorandum of Law at 1, *Felder v.*

7    *U.S. Tennis Ass'n*, No. 1:17-cv-05045-ER (S.D.N.Y. Feb. 4, 2019), ECF No. 56.   The

8    District Court granted the motion to dismiss with prejudice, again holding that

9    Felder had failed to allege that he was an employee of the USTA or that the USTA

10   was Felder's joint employer, because he "did not assert any additional facts to

11   prove the USTA shared immediate control over him with either CSC or AJ

12   Security."   App'x 187–88.   This appeal followed.[7]

13                            **DISCUSSION**

14       Felder appeals the dismissal of his amended complaint alleging that the

15   USTA violated Title VII, 42 U.S.C. §§ 2000e–2, 2000e–3(a), and 42 U.S.C. § 1981

16   when it refused to issue his security credentials, thereby rejecting him as a security

17   guard for the U.S. Open.   We "review de novo a dismissal of a complaint for

---

[7] On appeal, Felder is now represented by Court-appointed counsel.

1  failure to state a claim upon which relief may be granted." *Kelleher v. Fred A. Cook,*

2  *Inc.*, 939 F.3d 465, 467 (2d Cir. 2019).   Because Felder was a *pro se* litigant in the

3  court below, we construe his submissions "liberally and interpret[] [them] to raise

4  the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*,

5  470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks, emphasis, and citation

6  omitted).   Nevertheless, "even pro se plaintiffs asserting civil rights claims

7  cannot withstand a motion to dismiss unless their pleadings contain factual

8  allegations sufficient to raise a 'right to relief above the speculative level.'"

9  *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting

10  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

11  **I.      Title VII**

12      We start by addressing Felder's Title VII claims.   Title VII prohibits an

13  "employer" from "fail[ing] or refus[ing] to hire or to discharge any individual, or

14  otherwise to discriminate against any individual with respect to his compensation,

15  terms, conditions, or privileges of employment, because of such individual's race,

16  color, religion, sex, or national origin."   42 U.S.C. § 2000e–2.   Title VII also

17  prohibits an "employer" from "discriminat[ing] against any of his employees or

18  applicants for employment . . . because he has opposed any practice made an

1    unlawful employment practice by this subchapter, or because he has made a

2    charge, testified, assisted, or participated in any manner in an investigation,

3    proceeding, or hearing under this subchapter." *Id.* § 2000e–3(a).   In other words,

4    an employer cannot "retaliat[e] on account of an employee's having opposed,

5    complained of, or sought remedies for, unlawful workplace discrimination."

6    *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 342, 133 S.Ct. 2517

7    (2013).   Felder alleges that the USTA violated both provisions of Title VII when it

8    refused to issue his credentials, preventing him from working as a security guard

9    at the U.S. Open.

10       Felder's immediate hurdle to successfully litigating a Title VII claim against

11   the USTA is that "the existence of an employer-employee relationship is a primary

12   element of Title VII claims," and both parties agree that the USTA was not Felder's

13   direct employer.   *Gulino*, 460 F.3d at 370; *see also O'Connor v. Davis*, 126 F.3d 112,

14   115 (2d Cir. 1997) (holding that Title VII does not apply to an "unpaid intern"

15   because she is not an "employee"); *York v. Ass'n of Bar of City of New York*, 286 F.3d

16   122, 123 (2d Cir. 2002) (holding that a volunteer for the Association of the Bar of

17   the City of New York was not an employee under Title VII); *Eisenberg v. Advance*

18   *Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000) ("Title VII . . . cover[s]

13

1    'employees,' not independent contractors.").   We have recognized, however, that

2    "in certain circumstances" an employee may "assert employer liability against an

3    entity that is not formally his or her employer."   *Arculeo*, 425 F.3d at 197.

4    Pursuant to the "joint employer doctrine," one such circumstance exists when "an

5    employee, formally employed by one entity" is "assigned to work in

6    circumstances that justify the conclusion that the employee is at the same time

7    constructively employed by another entity."   *Id.* at 198.   "Where this doctrine is

8    operative . . . [the employee] may impose liability for violations of employment

9    law on the constructive employer, on the theory that this other entity is the

10   employee's joint employer."   *Id.*   Felder therefore argues that the USTA is

11   subject to Title VII as his joint employer.

12        Our Court has previously noted that the "joint employer doctrine"—which

13   has been employed in disputes regarding the National Labor Relations Act, *see*

14   *Clinton's Ditch Coop. Co. v. N.L.R.B.*, 778 F.2d 132 (2d Cir. 1985), and the Fair Labor

15   Standards Act, *see Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003)—is

16   applicable in the Title VII context.   *See Arculeo*, 425 F.3d at 198.   In *Arculeo*,

17   however, we caveated that we had "not yet fully analyzed or described a test for

18   what constitutes joint employment in the context of Title VII," and because it was

1  "not necessary for our resolution of [the] case . . . decline[d] to do so [t]here." *Id.*

2  at 199–200 n.7.   To decide, then, whether the USTA is Felder's joint employer we

3  must first determine "what constitutes joint employment in the context of Title

4  VII."

5                                          **A**

6        In order to understand what makes an entity a *joint* employer, we start by

7  examining the meaning of the terms "employer" and "employee" in Title VII.

8  Title VII defines the term "employer" to "mean[] a person engaged in an industry

9  affecting commerce who has fifteen or more employees . . . and any agent of such

10 a person."   42 U.S.C. § 2000e(b).   The term "employee" is, in turn, defined as "an

11 individual employed by an employer."   *Id.* § 2000e(f).   As we have remarked,

12 "neither definition is particularly helpful in deciding whether an employment

13 relationship exists," because these definitions are "circular."   *Gulino*, 460 F.3d at

14 370–71, 370 n.11.

15       The Supreme Court has instructed that when statutes contain "completely

16 circular" definitions, as Title VII does, courts should apply the "'well established'

17 principle that '[w]here Congress uses terms that have accumulated settled

18 meaning under . . . the common law, a court must infer, unless the statute

1 otherwise dictates, that Congress mean[t] to incorporate the established meaning

2 of these terms.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct.

3 1344 (1992) (quoting *Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739, 109

4 S.Ct. 2166 (1989)). Accordingly, in determining Congress's intended meaning of

5 the terms "employer" and "employee" in statutes mirroring the circular

6 definitions provided in Title VII, the Supreme Court has "relied on the general

7 common law of agency." *Reid*, 490 U.S. at 740, 109 S.Ct. 2166; *see, e.g.*, *Clackamas*

8 *Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444–45, 123 S.Ct. 1673 (2003)

9 (applying federal common law of agency to definition of "employee" under the

10 ADA); *Darden*, 503 U.S. at 323, 112 S.Ct. 1344 (applying federal common law of

11 agency to definition of "employee" under ERISA).

12  We have thus held that the common law of agency governs the meaning of

13 "employer" and "employee" in Title VII. *See United States v. City of New York*, 359

14 F.3d 83, 92 (2d Cir. 2004). This means that we apply a set of non-exhaustive

15 factors set forth by the Supreme Court that, when present, may indicate the

16 existence of an employer-employee relationship under the common law. *See id.*;

17 *Gulino*, 460 F.3d at 371. These factors include:

18  [T]he hiring party's right to control the manner and means by which
19  the product is accomplished ….[;] the skill required; the source of the

1    instrumentalities and tools; the location of the work; the duration of
2    the relationship between the parties; whether the hiring party has the
3    right to assign additional projects to the hired party; the extent of the
4    hired party's discretion over when and how long to work; the method
5    of payment; the hired party's role in hiring and paying assistants;
6    whether the work is part of the regular business of the hiring party;
7    whether the hiring party is in the business; the provision of employee
8    benefits; and the tax treatment of the hired party.

9    *Id.* (quoting *Reid*, 490 U.S. at 751–52, 109 S.Ct. 2166); *see generally* RESTATEMENT

10   (SECOND) OF AGENCY § 220 (1958). Broadly, these factors examine whether the

11   alleged employer "paid [the employees'] salaries, hired and fired them, and had

12   control over their daily employment activities," *Faush v. Tuesday Morning, Inc.*,

13   808 F.3d 208, 214 (3d Cir. 2015) (quoting *Covington v. Int'l Ass'n of Approved*

14   *Basketball Offs.*, 710 F.3d 114, 119 (3d Cir. 2013)), and the crux of these factors is "the

15   element of control." *Gulino*, 460 F.3d at 371; *see also Peppers v. Cobb Cnty.*, 835 F.3d

16   1289, 1297 (11th Cir. 2016) (considering "(1) how much control the alleged

17   employer exerted on the employee, and (2) whether the alleged employer had the

18   power to hire, fire, or modify the terms and conditions of the employee's

19   employment").

20       We will therefore find a *joint* employer relationship when two or more

21   entities, according to common law principles, share significant control of the same

22   employee. *See, e.g., Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1226 (10th

1    Cir. 2014) (quoting *Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d

2    1213, 1218 (10th Cir. 2002) ("Under the joint employer test, two entities are

3    considered joint employer . . . if they both 'exercise significant control over the

4    same employees.'"); *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204 (3d Cir. 2015)

5    (quoting *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997) ("[A] joint employment

6    relationship exists when 'two entities exercise significant control over the same

7    employees.'").   This means that an entity other than the employee's formal

8    employer has power to pay an employee's salary, hire, fire, or otherwise control

9    the employee's daily employment activities, such that we may properly conclude

10    that a constructive employer-employee relationship exists.[8]   Because the exercise

---

[8] We are not alone in looking to common law agency factors in discerning whether a joint employer relationship exists.   The Ninth and Third Circuits similarly look to common law agency principles.   *See U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 638 (9th Cir. 2019); *Faush*, 808 F.3d at 214.   The Fourth Circuit, however, applies a so-called "hybrid" test, that combines both common law agency principles with "the economic realities test."   *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015).   The "economic realities test," which "originated . . . in a Supreme Court case from the 1940s, in which the Court was asked to resolve whether a defendant was an employee or independent contractor for purpose of determining Social Security taxes," *id.* at 411 n.8, "focuses less on the legal parameters of employment, but more on the entity (or entities) . . . which the employee relies on for work and remuneration—irrespective of who is actually writing the paychecks and determining work status," *id.* at 412.

As some courts have aptly noted, the Fourth Circuit's "hybrid" test is likely no more expansive than "the common-law inquiry," as factors relevant under the "economic realities test" are also "relevant under the common law."   *Faush*, 808 F.3d at 219 n.9; *see also Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010) (concluding that

1    of control is the guiding indicator, factors indicating a joint-employment

2    relationship may vary depending on the case, and any "relevant factor[]

3    may . . . be considered so long as [it is] drawn from the common law of agency that

4    *Reid* seeks to synthesize."   *Eisenberg*, 237 F.3d at 114 n.1.   We are thus mindful

5    that "all of the incidents of the relationship must be assessed and weighed with no

6    one factor being decisive."   *Darden*, 503 U.S. at 324, 112 S.Ct. 1344 (quoting

7    *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 257, 88 S.Ct. 988 (1968)).

8                                                              **B**

9            With these principles in mind, we assess how the joint employer doctrine

10   applies in this case.   Our challenge is that most of the joint-employment factors—

11   *i.e.* discipline, pay, insurance, record-keeping, and supervision—presume an

---

"there is no functional difference" between the "common law agency test, an economic realities test, and a common law hybrid test") (internal quotation marks omitted)); *cf. Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir. 1993) ("[T]here is little discernible difference between the hybrid test and the common law agency test.   Both place their greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished and consider a non-exhaustive list of factors as part of a flexible analysis of the 'totality of the circumstances.'").   Indeed, the Fourth Circuit has itself noted that, "the common-law element of control remains the 'principal guidepost' in the analysis" of a joint employer relationship.   *Butler*, 793 F.3d at 414.   We therefore do not find it necessary to distinguish between these tests, emphasizing as other Circuits have that, in discerning a joint employment relationship, "'the principal guidepost' is the element of control," *Glob. Horizons, Inc.*, 915 F.3d at 638, and the totality of the circumstances should be considered.

1    *existing* relationship between two parties.   But here, the USTA allegedly denied

2    Felder his credentials *before* he could start work as a temporary security guard.

3    This leaves us to consider how to assess the pleading standards applicable to the

4    joint employer relationship in situations where the relationship has not yet

5    commenced in any meaningful way.

6          Fortunately, a different set of Title VII cases provides us with guidance:

7    cases involving independent contractors.   Under Title VII, a job applicant can sue

8    a potential employer for discrimination.   *See Gulino*, 460 F.3d at 374.   However,

9    because Title VII only protects employees and not independent contractors, *see*

10    *Salamon*, 514 F.3d at 226, Title VII similarly only protects applicants for

11    employment and "not . . . applicants for independent contractor positions."

12    *Knitter*, 758 F.3d at 1232; *E.E.O.C. v. MCI Telecomms., Inc.*, No. 98-1195, 1999 WL

13    547906, at *3 (4th Cir. 1999) ("Title VII's protective reach extends beyond

14    employees to cover job applicants, but only in the context of a potential

15    employment relationship.").

16          "[A] plaintiff who has never been employed by the defendant" must

17    therefore "prove that he or she was an 'applicant[] for employment,'" and not an

18    applicant for an independent contractor position.   *Knitter*, 758 F.3d at 1232

1    (quoting 42 U.S.C. § 2000e–3(a)).   To do so, she must successfully allege that "if

2    she *had been hired*," her relationship with the alleged employer "*would have been*

3    *more like a traditional employee than like a traditional independent contractor.*"

4    *See Fabian v. Hosp. of Central Conn.*, 172 F. Supp. 3d 509, 518 (D. Conn. 2016)

5    (emphasis added).   To determine whether she would be "more like a traditional

6    employee" than an independent contractor, she must plead, under common law

7    agency principles, that her alleged employer would have exerted control over the

8    terms and conditions of her anticipated employment by, for example, training,

9    supervising, and disciplining her.   *See, e.g.*, *id.* at 516–17; *Thomas v. Texaco, Inc.*,

10   998 F. Supp. 368, 370 (S.D.N.Y. 1998) (examining "common law agency principles"

11   to discern whether the plaintiff would have entered into an employer-employee

12   relationship had the plaintiff been "chosen for the position").   Absent any

13   allegations indicating that the parties intended to enter into an employer-

14   employee relationship, her Title VII claim must fail.   *See, e.g.*, *Adcock v. Chrysler*

15   *Corp.*, 166 F.3d 1290, 1293–94 (9th Cir. 1999) (holding that Chrysler could not be

16   liable under Title VII for discriminatory failure to hire because the intended

17   relationship between the parties "was to be one of independent contractual

18   affiliation"); *cf. Mangram v. Gen. Motors Corp.*, 108 F.3d 61, 64 (4th Cir. 1997)

21

1   (dismissing the plaintiff's employment discrimination claim under the ADEA

2   because "Mangram asks us to find that he held 'employee' status as a prospective

3   [General Motors] dealer when he would not have held that status if he had actually

4   become a General Motors dealer").

5       We think that the joint employer analysis in this case should be the same, as

6   we are tasked with assessing the same fundamental question: Did the parties

7   contemplate an employer-employee relationship that would permit Title VII

8   liability?  As in the cases cited above, the operative question here must be: Would

9   the USTA have been Felder's joint employer *had* Felder worked at the U.S. Open?

10   If not, the USTA cannot be liable under Title VII.

11                       **C**

12       At the motion to dismiss stage, a plaintiff's burden to answer this question

13   is not great.  It must only be plausible and not merely speculative, that the USTA,

14   as Felder's alleged joint employer, would have exerted significant control over the

15   terms and conditions of his employment as a security guard.  *See Twombly*, 550

1    U.S. at 556.   But Felder's complaint is devoid of any allegations directed at this

2    issue.

3         First, Felder does not allege that the USTA had any control over his hiring

4    or firing.   As our sister Circuits have remarked, a company does not *fire* a

5    subcontractor's employee merely by requesting that the subcontractor "no longer

6    assign" the employee to work at its facilities.   *Knitter*, 758 F.3d at 1229; *see also*

7    *Redd v. Summers*, 232 F.3d 933, 936–37, 940 (D.C. Cir. 2000) (noting that while "the

8    [defendant] had the right to reject any tour guide [hired by its

9    subcontractor] . . . [the subcontractor] did all the hiring and firing").   This is

10   because such a request does not terminate the employee's continued employment

11   with the subcontractor, nor prohibit the employee from working for other clients

12   of the subcontractor.   *See Knitter*, 758 F.3d at 1217; *Redd*, 232 F.3d at 940 ("[W]hile

13   the contract gives the [defendant] the right to reject any guide . . . the decision to

14   terminate the guide's employment with [the subcontractor] is solely within [the

15   subcontractor's] power.").

16        Felder did not allege, for example, that the USTA instructed AJ Security to

17   fire Felder upon refusing to issue his credentials.   He also did not allege that AJ

18   Security hired him for the sole purpose of working at the USTA and that the USTA

1    was aware that by denying his credentials it was effectively terminating his

2    employment with AJ Security.   Nor did he allege that the USTA exerted any

3    control over AJ Security's independent hiring process.

4          Felder also did not allege that the USTA would have been involved in

5    training him, supervising him, issuing his paychecks, covering his insurance or

6    other benefits, or controlling other means of his employment (such as providing

7    his uniform or other tools needed for the position).   *Cf. Faush*, 808 F.3d at 216

8    ("Tuesday Morning personnel gave Faush assignments, directly supervised him,

9    provided site-specific training, furnished any equipment and materials necessary,

10   and verified the number of hours he worked on a daily basis").   Absent these

11   types of factual allegations, we simply have no basis to conclude that the USTA

12   would have been Felder's joint employer.

13         In fact, there is some reason to doubt that the USTA would have exercised

14   significant control over Felder.   First, the "work functions" that security guards

15   are asked to perform for the USTA "compared to those of an ordinary [USTA]

16   employee," appear to be different.   *Butler v. Drive Auto. Indus. of Am., Inc.*, 793

17   F.3d 404, 414–15 (4th Cir. 2015) (considering "whether the individual's duties are

18   akin to a regular employee's duties" in determining "whether an individual is

24

1    jointly employed by two or more entities").    The USTA is "the national governing

2    body for tennis in the United States," App'x 160, and does not appear to be in—

3    nor does Felder make any allegation that it is in—the security guard business.

4    This suggests that the USTA would have left control over Felder's work as a

5    security guard to his formal employer, AJ Security.    Second, the USTA's influence

6    over AJ Security employees may have been diluted by the fact that AJ Security was

7    a subcontractor of CSC and thus two steps removed from the USTA's immediate

8    control.

9          Felder's only allegation about the control the USTA exerted is that it could

10    effectively reject AJ Security employees by refusing to issue them credentials.    We

11    cannot conclude that this allegation alone is enough to adequately plead a joint-

12    employment relationship.    *Cf. N.L.R.B. v. W. Temp. Servs., Inc.*, 821 F.2d 1258,

13    1266–67 (7th Cir. 1987) (finding a joint employer relationship where the company

14    could "refuse[] a referral" but also where the company had "exclusive control over

15    the day-to-day activities of the part-time workers who [were] referred to it"

16    including "train[ing], assign[ing] work, and supervis[ing] them.").    There are

17    many reasons why an entity might reasonably reject the temporary services of a

18    subcontractor's employee.    It may decide, for example, that it is already

1    sufficiently staffed for a particular event.    Or it may determine that the individual

2    lacks the requisite skill set needed for the particular role, or is otherwise unfit for

3    the position.    *Cf. Redd*, 232 F.3d at 940 ("[T]he client's command to remove a

4    specific worker (say, on grounds of rudeness or just personal incompatibility)

5    would hardly render the worker an employee of the client."); *Zinn v. McKune*, 143

6    F.3d 1353, 1356–58 (10th Cir. 1998) (holding that the Kansas Department of

7    Corrections was not rendered an employer when it requested the reassignment of

8    a contractor's employee for "inappropriate behavior").    The joint employer

9    doctrine does not require that an entity exert *no* control over who may or may not

10   work at its facilities, only that it may not exert *significant* control without being

11   subject to Title VII.

12         Moreover, were it enough to say that the USTA's *refusal* to issue credentials

13   automatically rendered it a joint employer to Felder, we would be required to say

14   that *issuing* credentials also renders it a joint employer, as both equally

15   demonstrate the exertion of some control over who may work as a security guard

16   at the U.S. Open.    But this would eliminate the need to consider any other indicia

17   of a common law agency relationship in applying the joint employer doctrine;

18   would vastly expand Title VII liability in a manner that no other Circuit has

1    endorsed; and would contravene the Supreme Court's instruction that we turn to

2    a multi-factor analysis under the common law of agency for discerning whether

3    an employer-employee relationship exists.    *See, e.g.*, *Clackamas*, 538 U.S. at 449–51,

4    123 S.Ct. 1673.

5          This, of course, is not to say that we are not without concern for a

6    subcontractor's employee who, like Felder, believes that he has been denied an

7    opportunity for discriminatory or retaliatory reasons.    And we recognize, as the

8    dissent notes, that if outside the scope of Title VII, subcontractors' employees may

9    be vulnerable to discrimination or retaliation from companies like USTA that

10   subcontract work rather than hire employees themselves.    But Congress did not

11   "extend Title VII liability in a general way," limiting it instead to "traditional

12   common-law employers" and a few "additional groups" not relevant here.

13   *Gulino*, 460 F.3d at 375.   Absent further pleading to "justify the conclusion that

14   [Felder] is being employed jointly by two distinct employers," *Arculeo*, 425 F.3d at

15   199, we cannot circumvent Congress's intent by expanding Title VII liability in this

16   case.   "[I]t is for Congress, if it should choose to do so, and not this court, to

17   provide a remedy under . . . Title VII . . . for plaintiffs in [Felder]'s position."

18   *O'Connor*, 126 F.3d at 119.

1      We therefore hold that Felder did not plausibly allege that the USTA was

2      his employer merely by asserting that it refused to issue his credentials.   Absent

3      further allegations that the USTA would have significantly controlled the manner

4      and means of Felder's work as a security guard, the complaint does not cross the

5      line from speculative to plausible on the essential Title VII requirement of an

6      employment relationship.   For this reason, the District Court did not err in

7      dismissing Felder's Title VII claims.

8                           **II.   42 U.S.C. § 1981**

9      That leaves us to consider Felder's remaining claim under 42 U.S.C. § 1981.

10     Section 1981 provides that all persons "shall have the same right in every State and

11     Territory to make and enforce contracts, to sue, be parties, give evidence, and to

12     the full and equal benefit of all laws and proceedings for the security of persons

13     and property as is enjoyed by white citizens."   Felder asserts that the USTA

14     violated § 1981 by "intentionally thwart[ing his] employment contract, or efforts

15     to contract for employment [with AJ Security], because of intentional racial

16     discrimination."[9]   Appellant Br. at 28.

---

[9] In addition to claims of discriminatory interference with contract, "42 U.S.C. § 1981 encompasses claims of retaliation."   *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008).   On appeal, however, Felder only argues that the USTA "discriminatorily denied Mr. Felder's credentials to work the 2016 US Open," thereby "depriv[ing him] of

1    "[U]nlike Title VII," § 1981 plaintiffs can "under certain circumstances . . .

2    sue persons other than [their] employers."   *Turley v. ISB Lackawanna, Inc.*, 774 F.3d

3    140, 151 n.6 (2d Cir. 2014); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d

4    Cir. 2004).   We need not address, however, whether Felder can appropriately sue

5    the USTA under § 1981 even though it is not his employer, because even assuming

6    he can, we find that Felder has failed to plausibly allege a claim of racial

7    discrimination.

8    "To establish a claim under 42 U.S.C. § 1981," a plaintiff "must allege facts

9    supporting" that "(1) [the plaintiff is a] member[] of a racial minority; (2)

10   defendant['s] intent to discriminate on the basis of race; and (3) discrimination

11   concerning one of the statute's enumerated activities."   *Brown v. City of Oneonta*,

12   221 F.3d 329, 339 (2d Cir. 2000); *see also Comcast Corp. v. Nat'l Ass'n of African*

13   *American-Owned Media*, 140 S.Ct. 1009, 1019 (2020) ("[A] plaintiff must initially

---

the right to contract for gainful employment with AJ Security."   Appellant Br. at 27; *see also id.* ("Mr. Felder's *pro se* complaint states a plausible claim that the USTA interfered with his right to be free of racial discrimination in making and enforcing an employment contract.").   Because Felder does not argue that his § 1981 claim is based on retaliatory interference with contract, we consider that argument waived.   *See Chevron Corp. v. Donziger*, 990 F.3d 191, 203 (2d Cir. 2021).

1 plead and ultimately prove that, but for race, [he] would not have suffered the loss

2 of a legally protected right.").

3   Felder pled no facts suggesting that the USTA denied his security

4 credentials *because of his race*.    Nor did he offer any allegations suggesting that the

5 USTA had a policy of not accepting Black security guards, or that he was treated

6 differently than other "similarly situated" security guards.    *See Ruiz v. Cnty. of*

7 *Rockland*, 609 F.3d 486, 493 (2d Cir. 2010).    We therefore affirm the District Court's

8 dismissal of Felder's claim under § 1981.

9        **III.    Request for Leave to Amend**

10   Finally, Felder asks us to remand to the District Court so that he can amend

11 his complaint for a second time.    Ordinarily, "[w]hen a plaintiff has not moved

12 for leave to amend in the district court, we are . . . disinclined to exercise our

13 discretion to grant his belated request on appeal."    *Kirsch v. Fleet St., Ltd.*, 148 F.3d

14 149, 171 (2d Cir. 1998).    And we certainly see no error or abuse of discretion in the

15 District Court's dismissal of Felder's complaint with prejudice, as Felder did not

16 request leave to re-amend until this appeal, and "no court can be said to have erred

1    in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364,

2    369 (2d Cir. 2011).

3          Nevertheless, Felder, now represented by counsel for the first time on

4    appeal, has provided us with some "detail about . . . proposed new allegations"

5    and "explained how they could cure the deficiencies that led to the dismissal of

6    his complaint." *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 140 (2d Cir. 2011).

7    Felder asserts that he can "ple[a]d additional USTA control mechanisms based on

8    information and belief gleaned over years of prior experience" working at the U.S.

9    Open, and can also "reference[] . . . the written agreement between [the] USTA and

10   its security subcontractors" to establish the proposed relationship between the

11   USTA and the security guards.    Appellant Reply Br. at 21–22.

12         Moreover, we conclude that Felder's complaint, liberally read, may suggest

13   that the USTA did in fact retaliate against him for his earlier complaint against a

14   USTA security contractor—namely, CSC.    Felder alleged that he was "hired . . .

15   by AJ Squared Security," that AJ Security sent him to pick up his security

16   credentials at the USTA, that the USTA denied those credentials, and that he was

17   then informed by his AJ Security supervisor that the USTA denied his credentials

18   because of his earlier discrimination claim against CSC.    App'x 143, 174.    If true,

1    and if the USTA were indeed Felder's joint employer, this could plausibly set forth

2    a retaliation claim under Title VII.   *See McMenemy v. City of Rochester*, 241 F.3d

3    279, 284–85 (2d Cir. 2001) (finding a retaliation claim "especially appropriate

4    where . . . two employers have a relationship that may give one of them an

5    incentive to retaliate for an employee's protected activities against the other.").

6         We therefore agree that Felder should be permitted to amend his complaint

7    regarding his Title VII retaliation claim under 42 U.S.C. § 2000e–3(a) so that he

8    may allege, if possible, additional indicia of a joint employer relationship.   Felder

9    has not demonstrated, however, that his failure to plead allegations necessary to

10   support a race discrimination claim under Title VII or § 1981 can be remedied

11   through a second amended complaint.   Absent any "indication as to what

12   [Felder] might add to [his] complaint in order to make [these claims] viable,"

13   *Wilson*, 671 F.3d at 140 (citation and quotation marks omitted), we solely exercise

14   our discretion to vacate and remand the District Court's dismissal of Felder's Title

15   VII retaliation claim.

16                                **CONCLUSION**

17        For the foregoing reasons, we **AFFIRM** the District Court's dismissal of

18   Felder's discrimination claims under Title VII, 42 U.S.C. § 2000e–2, and 42 U.S.C.

1    § 1981.   We **VACATE** the District Court's dismissal of Felder's retaliation claim

2    under Title VII, 42 U.S.C. § 2000e–3(a) and **REMAND** with instructions that Felder

3    be permitted to amend his complaint as to this remaining claim.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit